UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

JAMES ALBERT,

*Petitioner,*

– against –

SUPERINTENDENT M.J. KING,

*Respondent.*

**MEMORANDUM & ORDER**
24-cv-05052 (NCM)

---

**NATASHA C. MERLE**, United States District Judge:

Petitioner James Albert, who is currently incarcerated at Clinton Correctional Facility, petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Albert was convicted after a jury trial of one count of first-degree robbery, one count of second-degree robbery, one count of second-degree burglary, and one count of fifth-degree criminal possession of stolen property. Appearing pro se, Albert brings this Petition for habeas relief alleging that the trial court violated his Fourth Amendment rights when it declined to suppress evidence against him and found that his search and seizure was supported by probable cause.[1] For the reasons set forth below, Albert's Petition is DENIED.

---

[1]    The Court hereinafter refers to the Petition for Writ of Habeas Corpus, ECF No. 1, as the "Petition"; and respondent's Memorandum in Opposition, ECF No. 9-1, as the "Opposition."

## BACKGROUND

### A. The Crime and Arrest

On January 22, 2015, at approximately 7:50 p.m., police officers Brian Benedict and Anthony LoMonaco were on plainclothes patrol in Queens, New York when they learned over the radio of a nearby robbery in progress. Trial Transcript ("Trial Tr."), ECF No. 10-1, 468:11–469:20.[2] Benedict and LoMonaco responded to the call, arriving at a Verizon mobile phone store where they encountered two distressed employees. Trial Tr. 184:17–22; 470:05–25. One of those employees was a man named Tarandeep Singh. Trial Tr. 471:06–08. According to Singh, two masked black men wearing distinctive clothing, one of whom Singh later identified as petitioner, entered the Verizon store just moments prior, stole merchandise, and quickly left. Trial Tr. 351:10–13; Hearing Transcript ("Hr'g Tr."), ECF No. 10, 07:04–06. Singh said that one of these men was brandishing a firearm during the robbery. Hr'g Tr. 07:05.

When the perpetrators exited the Verizon store with the stolen merchandise, Singh pursued them and "fought with them in the store a little bit, and in front of the store as well." Hr'g Tr. 07:09–11. Singh testified that upon exiting the store he observed a double-parked, "black Murano" that the two perpetrators were attempting to enter. Trial

---

[2]    Throughout this Order, page numbers for docket filings refer to the page numbers assigned in ECF filing headers. The factual background presented here is derived principally from the suppression hearing and trial transcripts and otherwise reflects information in the state court records. Because petitioner was convicted, the Court construes the facts "in the light most favorable to the prosecution." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) ("[W]e review the evidence in the light most favorable to the State and the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial."); *Cruz v. Colvin*, No. 17-cv-03757, 2019 WL 3817136, at *12 (E.D.N.Y. Aug. 14, 2019) (citing, *inter alia*, *Jackson* and *Ponnapula*).

Tr. 355:13–17. At this point Singh jumped on one of the perpetrators and "tried to just hold him down." Trial Tr. 354:20–22. Singh then "heard three shots" discharged from a weapon, let go of the perpetrator, and watched the two men who had stolen merchandise from the store, as well as the third man, enter the vehicle and drive off. Hr'g Tr. 07:18–23; Trial Tr. 355:08–12.

Following the officers' conversation with Singh, LoMonaco left the Verizon store to canvass outside for potential witnesses. Hr'g Tr. 08:01–02; Trial Tr. 185:07–24. He found several in the immediate area. Trial Tr. 185:19–186:23. One of the witnesses, a retired police officer named Paul Feddern, provided LoMonaco with a description of the vehicle, which he described as a "dark colored SUV," as well as the vehicle's license plate. Hr'g Tr. 27:21–28:16; *see* Trial Tr. 88: 15–89:07; 186:17–187:08. LoMonaco informed Benedict of these details, and each officer broadcast the information over police radio. Trial Tr. 187:09–188:06; Hr'g Tr. 07:24–08:20; 46:23–47:03.

New York Police Department Lieutenant George Hellmer, who was on duty at the 104th Precinct near Cyprus Avenue and Vermont Place, heard a radio transmission from the 112th Precinct reporting an armed robbery from which the perpetrators fled in a "black Nissan Murano" bearing a unique license plate number. Hr'g Tr. 118:22–119:17. Hellmer thereafter received a radio report from a different officer who had identified a vehicle matching the description of the Nissan Murano at the intersection of the Jackie Robinson Parkway and Jamaica Avenue. Hr'g Tr. 119:23–120:11. Hellmer drove to that location and confirmed that the vehicle matched the appearance and license plate number described over the initial radio broadcast from the 112th precinct. Hr'g Tr. 120:14–122:06. He then followed the Nissan Murano while transmitting updates via radio. Hr'g Tr. 122:07–122:18. After approximately five blocks, the Murano suddenly stopped on the left side of

the road. Hr'g Tr. 122:16–20.

At approximately 8:05 p.m. Hellmer stopped his vehicle in front of the Nissan Murano, approached the right rear passenger door with two additional officers, and opened the door to find three individuals—including petitioner—inside. Hr'g Tr. 122:22–123:08; 123:23–24; 127:23–129:12. Hellmer ordered petitioner and the two other men later identified as his co-defendants to put their hands in the air. Hr'g Tr. 130:15–22. Police then removed petitioner and his co-defendants from the vehicle one by one, placing them in handcuffs, frisking them for weapons, and putting them on their knees. Hr'g Tr. 123:09–19.

At approximately 8:30 p.m. Benedict brought Singh to the scene, which was estimated to be approximately three to five miles from the Verizon store. Hr'g Tr. 12:18–22. Upon seeing petitioner, Singh stated that he was "100 percent sure" that petitioner was one of the men who robbed the store. Hr'g Tr. 13:22–24. Benedict recognized petitioner's camouflage-pattern trousers and brown boots from the surveillance recording. Hr'g Tr. 09:04–17; 14:02–03. Benedict later executed a search warrant on the Nissan Murano, recovering articles of clothing matching the other robbers seen in the Verizon store's surveillance video. Hr'g Tr. 16:05–21. A further search of the petitioner revealed a wallet containing Singh's social security card, photo identification, and other items belonging to him; a cellular telephone; and $857 in cash. Hr'g Tr. 20:04–21:02; Trial Tr. 476:12–477:13.

### B. Pretrial Proceedings

Prior to trial, petitioner moved to suppress evidence associated with his arrest, including the observations of the officers and the property recovered from his person. Hr'g Tr. 360:13–15. The trial court held a suppression hearing on December 10, 2015. At

that hearing, petitioner argued that all of the evidence seized from his person should be suppressed because the police officers did not have probable cause to arrest him. Hr'g Tr. 220:11–224:01. During the hearing, petitioner's counsel thoroughly cross-examined several officers involved in the arrest. Hr'g Tr. 82:01–114:07 (Benedict); 147:21–157:18 (Hellmer); 176:15–200:09 (Nunez). At the end of the hearing, counsel requested leave to file additional briefing on the suppression issue. Hr'g Tr. 163:18–19. The court granted the request. Hr'g Tr. 163:20; *see* State Record 24–52, ECF No. 8.

On September 7, 2016, the trial court issued a memorandum decision denying petitioner's motion to suppress. State Record 54–59. Specifically, the trial court found the following facts, considered in totality, sufficient to support probable cause: (1) "[petitioner] was the front seat passenger in the vehicle that he was observed in when he fled the scene of the robbery," (2) "the license plate and description of [that] vehicle had been provided" by witnesses to the crime, (3) petitioner's "co-defendant . . ., fitting the description of the perpetrators[,] was in the SUV," and (4) petitioner was "identified as one of the perpetrators" after the stop. State Record 57. And as to the property recovered from petitioner's person, the court found that "once [petitioner] was in custody and probable cause was established . . . the property recovered . . . was properly recovered as incident to a lawful arrest." State Record 58.

On March 29, 2017, petitioner moved to reopen the suppression hearing. Hr'g Tr. 170:21–171:22; 328:17–21. The court granted the request. At that hearing, petitioner's counsel presented additional evidence in an attempt to undermine certain officers' testimony from the initial hearing. *See* Hr'g Tr. 223:12–225:21. The court declined to modify its ruling that petitioner's arrest was supported by probable cause. Hr'g Tr. 227:18–228:21.

5

*C. Trial & Deliberations*

At trial, the prosecution presented evidence of the crime through eight witnesses as well as videos, photographs, maps, audio recordings, and clothing. *See* Trial Tr. 858:01–859:25. The defense did not present any witnesses. Trial Tr. 658:16–660:11. Most relevant to the issues presented by the instant Petition are the testimonies of the Verizon employee, Singh, the two responding officers, Benedict and LoMonaco, the arresting officer, Hellmer, and the officer that transported petitioner from the scene of the arrest to the police station, Nunez.

Singh testified that on January 22, 2015, he was working at the Verizon store on Metropolitan Avenue in Forest Hills, New York. Trial Tr. 346:14–19. He said that around 7:45 p.m. that evening, two men entered the store, one with a gun, and robbed the store. Trial Tr. 349:09–350:16. He described the man with the gun as wearing "a black sweatshirt, a hat, a mask, and . . . Army like looking camouflage pants with Tim[berlands] on for shoes." Trial Tr. 351:10–13. After the two men robbed and left the store, Singh went outside, where he saw "the guy in the camo[uflage] pants" with "the bag . . . where he had stuffed all the phones" taken from the store. Trial Tr. 353:04–354:04. Singh also observed a black [Nissan] Murano "about halfway down the block." Trial Tr. 354:13–19. Singh said that he jumped on the man in the camouflage pants in an attempt to hold him down, Trial Tr. 354:20–355:12, but ultimately let the man go when the black Nissan Murano pulled up behind them, Trial Tr. 356:17–20. As he fled, Singh saw the driver of the Nissan Murano help the man in the camouflage pants into the SUV. Trial Tr. 356:21–25.

Singh testified that later that evening, police presented three individuals to him, and he identified the man in the camouflage pants as one of individuals who had robbed the store. Trial Tr. 358:17–25. Singh said that he identified the man in the camouflage

pants "right away." Trial Tr. 359:20–22. He also testified that "the first person [presented to him] was definitely" one of the men who had robbed the store. Trial Tr. 360:05–10.

Benedict testified that around 7:50 p.m. on January 22, he received a report of a robbery in progress at 98-06 Metropolitan Avenue. Trial Tr. 469:10–20. He said that he and LoMonaco went to that address, which was a Verizon cell phone store. Trial Tr. 470:02–07. Once inside, Benedict spoke with the store employees, including Singh. Trial Tr. 471:08–09. He also reviewed surveillance video footage from the store, which depicted a man "in camo[uflage] pants and . . . a dark outer garment." Trial Tr. 471:09–472:06.

Benedict testified that once they had secured the scene, he took Singh to a location where several individuals were presented to him for identification. Trial Tr. 472:20–473:24. Benedict testified that the first individual presented to Singh for identification was petitioner. Trial Tr. 473:25–474:05.

LoMonaco corroborated Benedict's testimony regarding the officers responding to the scene of the crime and speaking with Singh. Trial Tr. 182:03–184:24. He said that after he left the Verizon store, he found a witness in the immediate area. Trial Tr. 185:07–18; 186:17–23. The witness, a retired police officer named Paul Feddern, told LoMonaco that he knew the license plate number of the vehicle in which the perpetrators had escaped and provided LoMonaco with that license plate. Trial Tr. 186:17–187:08. LoMonaco broadcast the information over police radio. Trial Tr. 187:09–188:06.

Hellmer testified that on January 22, 2015, he heard a radio broadcast indicating that there was a robbery and that the perpetrator fled in a Nissan Murano on Woodhaven Boulevard. Trial Tr. 247:20–22; 248:13–19. He said that the broadcast included a description of the vehicle, the associated license plate number, and the vehicle's direction

7

of travel. Trial Tr. 249:18–25. Hellmer began to look for the vehicle and was shortly thereafter advised by a subsequent radio broadcast that another police officer had spotted the vehicle at the end of the Jackie Robinson Parkway at Jamaica Avenue. Trial Tr. 250:20–251:02. Hellmer traveled to that location and "observed a black Nissan Murano bearing the license plate that was transmitted over the radio." Trial Tr. 251:07–13. Hellmer followed the vehicle until it came to a sudden stop. Trial Tr. 253:03–20. At that point, Hellmer stopped his car, exited his vehicle, approached the Nissan Murano, opened the door, and directed the individuals inside to put their hands in the air. Trial Tr. 254:03–25. He then directed the petitioner, who was sitting in the front passenger seat, out of the car, frisked him, and put him in handcuffs. Trial Tr. 255:23–256:06.

Finally, Nunez testified that he was the officer assigned to transport petitioner from the scene of the arrest to the precinct. Trial Tr. 308:08–17. Nunez said that when he conducted a search of petitioner's person, he found a wallet containing Singh's social security card and picture I.D., as well as other documents bearing Singh's name. Trial Tr. 309:23–310:01; 312:01–24. Nunez testified that the wallet was recovered from petitioner's pants pocket, and that the pants petitioner was wearing at the time were "Army camouflage, Army green, something like that." Trial Tr. 310:05–10.

On April 18, 2017, the jury announced a verdict of guilty on one count of first-degree robbery, one count of second-degree robbery, one count of second-degree burglary, and one count of fifth-degree criminal possession of stolen property. Trial Tr. 848:18–19; 851:17–852:11. On June 12, 2019, the Supreme Court of Kings County imposed concurrent prison terms of 23 years to life on the first-degree robbery conviction, 16 years to life on the second-degree robbery and second-degree burglary convictions, and

8

1 year on the fifth-degree criminal possession of stolen property conviction. Trial Tr. 876:13–24.

### D. Direct Appeal

In November 2022, Albert perfected a direct appeal to the Second Department with the assistance of counsel. First, he argued that the trial court erred when it denied suppression of evidence against him on the basis that his temporary detention was in fact supported by probable cause. State Record 83. Second, he argued that his sentence of 23 years to life should be reduced in the interests of justice. State Record 97.

The Second Department unanimously affirmed Albert's judgment of conviction on June 15, 2023. *See People v. Albert*, 217 A.D.3d 776, 777 (2d Dep't 2023). The court found that the "Supreme Court properly denied that branch of [petitioner]'s omnibus motion which was to suppress physical evidence" since petitioner's initial detention "did not constitute a de facto arrest" considering that "it was brief and occurred at the location where the defendant was stopped." *Id.* at 776. The Second Department further reasoned that even though petitioner "was handcuffed and . . . the officers approached with their hands on their holsters" that "did not elevate the detention to a de facto arrest because the officers' actions were based on the reasonable belief that the defendant was armed and dangerous." *Id.* The court concluded petitioner's temporary detention needed to be supported by reasonable suspicion, which existed "based upon the contents of a fellow police officer's radio broadcast providing a specific description of the getaway vehicle, including its license plate number, which was obtained by a police officer who canvassed the area to locate witnesses, the proximity to the site of the crime, and the short passage of time between the commission of the crime and the observation of the defendant." *Id.* at 777.

Shortly thereafter, Albert sought leave—again through counsel—to appeal the Appellate Division's decision to the New York Court of Appeals. State Record 202. Petitioner's application sought leave to appeal on the basis that his arrest was unsupported by probable cause and that the appellate court erroneously affirmed the trial court's suppression hearing ruling, given that it found the stop was supported by reasonable suspicion instead of probable cause. *See* State Record 204–08. Judge Garcia denied the application on September 27, 2023. *See People v. Albert*, 40 N.Y.3d 995 (2023).

### E. District Court Proceedings

Petitioner, proceeding pro se, filed the instant Petition on July 18, 2024. Pet. 1. Construed liberally, his Petition asserts one ground for habeas relief—the prosecution failed to establish probable cause for his arrest and thus the evidence seized during that arrest should have been suppressed. Pet. 5, 16–21.[3]

## LEGAL STANDARD

---

[3]      The argument in the petition is the same as the one raised in petitioner's reply brief in his direct appeal. *Compare* Pet. 16–21 *with* State Record 192–198. In that brief, and in his petition, petitioner argues that he has "fully preserved" the argument that the State "failed to establish probable cause for his arrest" and that the court "lacks the power to review the [State]'s argument that all that was required to support appellant's arrest was reasonable suspicion." Pet. 5; State Record 192. Because petitioner's basis for the suppression hearing and subsequent direct appeal was the purported lack of probable cause for his arrest, the Court construes that issue as the basis for the Petition. In any case, to the extent petitioner argues that the Second Department violated N.Y.C.P.L. § 470.15(1) by affirming the trial court on a ground that was "not ruled upon[] by the trial court," *People v. Chazbani*, 144 A.D.3d 836, 838 (2d Dep't 2016) (quoting *People v. LaFontaine*, 92 N.Y.2d 470, 474 (1998)), that is a state law claim. "28 U.S.C. § 2254 allows a court to entertain a habeas petition only on the ground that an individual is in custody in violation of the Constitution or laws or treaties of the United States." *Garner v. Lee*, 908 F.3d 845, 860 (2d Cir. 2018).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") narrowed the scope of federal habeas review of state convictions where the state court has adjudicated a petitioner's federal claim on the merits. *Fox v. Bezio*, No. 10-cv-02986, 2011 WL 837158, at *5 (E.D.N.Y. Mar. 7, 2011) (citing 28 U.S.C. § 2254(d)). Under AEDPA, federal habeas relief is available when "a person in custody pursuant to the judgment of a State court . . . is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Federal habeas relief is only available for a violation of federal law, as "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).[4]

AEDPA provides that an "application for a writ of habeas corpus . . . pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings," unless adjudication of that claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(1)–(2). A decision on the merits is "contrary to clearly established" federal law if the state court (1) "arrives at a conclusion opposite to one reached by the Supreme Court on a question of law"; or (2) "decides a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Jones v. Perez*, No. 14-cv-03971, 2015 WL 5923548, at *4 (E.D.N.Y. Oct. 10, 2015) (citing *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). A state court decision is an "unreasonable application" of clearly established federal law if the

---

4    Throughout this Order, the Court omits all internal quotation marks, footnotes, and citations, and adopts all alterations, unless otherwise indicated.

11

state court identifies the correct controlling legal principle announced by the Supreme Court but unreasonably applies that principle to the facts of the petitioner's case. *Id.* (citing *Williams*, 529 U.S. at 407). This deferential standard of review, known as "AEDPA deference," "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011).

AEDPA deference applies only to federal claims "adjudicated on the merits" in state court. 28 U.S.C. § 2254(d). Merits adjudication occurs when a state court "disposes of the claim on the merits" and "reduces its disposition to judgment." *Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007). When multiple state courts consider a case, including on direct appeal, the Court reviews the last state court decision that explained its reasoning, even if a higher court reviewed the case. *See Wilson v. Sellers*, 584 U.S. 122, 125 (2018) ("[T]he federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.").

When there has been an adjudication on the merits, AEDPA deference "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010). In practice, this means that a district court may not overturn a state court's application of federal law if it is merely incorrect, but only if it is objectively "unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). In other words, a district court may overturn a state court's application of federal law only if it is "so erroneous that there is no possibility fairminded jurists could disagree that the state court's decision conflicts with the Supreme Court's precedents."

12

*Baez v. Royce*, No. 20-cv-01669, 2024 WL 2022090, at *8 (E.D.N.Y. May 3, 2024) (quoting *Nevada v. Jackson*, 569 U.S. 505, 508–09 (2013)).

The Court is obliged to construe pro se pleadings liberally and interpret them "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006); *see Williams v. Kullman*, 722 F.2d 1048, 1050 (2d Cir. 1983). Nevertheless, a pro se litigant is not exempt "from compliance with relevant rules of procedural and substantive law." *Williams v. People*, No. 23-cv-10027, 2024 WL 421130, at *1 (S.D.N.Y. Jan. 4, 2024) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)).

## DISCUSSION

The Petition raises one ground for relief. Petitioner asserts that his Fourth Amendment rights were violated when the trial court declined to suppress evidence recovered pursuant to a search and seizure that petitioner contends was not supported by probable cause. Pet. 5, 16–21.

### I.  Ground One: Fourth Amendment Claim

Albert asserts that the trial court violated his Fourth Amendment right against unreasonable searches and seizures because it did not suppress evidence even though the State "failed to establish probable cause for his arrest." Pet. 5. Petitioner raised this ground for relief in the suppression hearing, in his direct appeal to the Second Department, and in his application seeking leave to appeal to New York's Court of Appeals. State Record 192–198; 207. Therefore, this ground for relief is properly preserved for habeas review. *See Diguglielmo v. Senkowski*, 42 F. App'x 492, 494 (2d Cir. 2002) ("State remedies are deemed exhausted when a petitioner has: (i) presented the federal constitutional claim asserted in the petition to the highest state court (after

13

preserving it as required by state law in lower courts); and (ii) informed that court of both the factual and legal bases for the federal claim.") (summary order).

Generally, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976). The Second Circuit has developed a "litmus test to discern when a state prisoner has been denied an opportunity for full and fair litigation of his fourth amendment claims." *Angeles v. Greiner*, 267 F. Supp. 2d 410, 416 (E.D.N.Y. 2003) (*quoting Capellan v. Riley,* 975 F.2d 67, 70 (2d Cir.1992)). A district court may review a Fourth Amendment claim only where (1) "the state provides no corrective procedures at all to redress Fourth Amendment violations" or (2) a satisfactory corrective procedure exists but "the defendant is precluded from utilizing it by reason of an unconscionable breakdown in that process." *Id.* (quoting *Gates v. Henderson,* 568 F.2d 830, 840 (2d Cir. 1977)). Once a "petitioner has had an opportunity to litigate his or her Fourth Amendment claim (whether or not he or she took advantage of the state's procedure), the court's denial of the claim is a conclusive determination that the claim will never present a valid basis for federal habeas relief." *Graham v. Costello*, 299 F.3d 129, 134 (2d Cir. 2002). Because petitioner has not demonstrated a lack of procedure for addressing Fourth Amendment claims generally, nor an unconscionable breakdown in the process of addressing his claim specifically, the Petition must be dismissed.

First, New York provides procedures for redressing Fourth Amendment violations, *see* N.Y. Crim. P. L. § 710.10 *et seq.*, and courts in this Circuit reviewing similar habeas claims have consistently "approved New York's procedure for litigating Fourth

Amendment claims . . . as being facially adequate." *See e.g.*, *Bell v. Ercole*, 631 F. Supp. 2d 406, 416 (S.D.N.Y. 2009) (quoting *Capellan*, 975 F.2d at 70 n.1); *Crispino v. Allard*, 378 F. Supp. 2d 393, 413 (S.D.N.Y. 2005) ("It has long been acknowledged that New York provides adequate procedures for litigating Fourth Amendment claims."). Indeed, "the Second Circuit has effectively rejected the first method of demonstrating the denial of full and fair litigation of a Fourth Amendment claim at the New York State court level." *Long v. Donnelly*, 335 F. Supp. 2d 450, 458 (S.D.N.Y. 2004). Therefore, the relevant question is whether there was an unconscionable breakdown that prevented petitioner from utilizing New York's approved procedure for litigating his Fourth Amendment claim.

The record indicates no such breakdown. On the contrary, the record establishes that petitioner "fully availed himself" of the process for litigating his Fourth Amendment claims. *Walker v. Walker*, 259 F. Supp. 2d 221, 225 (E.D.N.Y. 2003). Petitioner did so by (1) arguing at the suppression hearing that all tangible or testimonial evidence obtained following the arrest should be suppressed, Opp'n 4; *see* Hr'g Tr. 360:13–15; (2) filing additional briefing on the probable cause issue after the hearing, State Record 33–38; (3) moving to reopen the suppression hearing and presenting additional evidence at that hearing in an attempt to undermine witnesses from the initial hearing, Opp'n 8; *see* Hr'g Tr. 222:21–225:21; 227:18–228:21; (4) arguing that his arrest was not supported by probable cause on direct appeal, Opp'n 11–12; Pet. 25–31; State Record 83–95; and (5) seeking leave to appeal the Second Department's decision affirming the trial court's ruling, State Record. 202–212. And at all stages, petitioner utilized the process through counsel.

The trial court concluded that no Fourth Amendment violation had occurred— twice—and that the evidence was admissible at trial. On appeal, the Appellate Division

unanimously affirmed the petitioner's conviction, finding that the "Supreme Court properly denied that branch of [petitioner's] omnibus motion which was to suppress physical evidence." *Albert*, 217 A.D.3d at 776.

Although petitioner disagrees with the determinations of the courts in which he litigated his Fourth Amendment claim, "[m]ere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process." *Capellan,* 975 F.2d at 72; *Cf. Grajales v. Brown*, No. 08-cv-00788, 2008 WL 2313137, at *6 (E.D.N.Y. June 2, 2008) (finding no unconscionable breakdown where the police failed to preserve evidence because the petitioner was able to "participate[] in a full suppression hearing and cross-examine[] the government's witnesses").

### CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied and the case is dismissed. As Albert has failed to make a substantial showing that he was denied any constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c).

The Clerk of Court is respectfully directed to enter judgment and mark the case as closed.

**SO ORDERED.**

   */s/ Natasha C. Merle*
NATASHA C. MERLE
United States District Judge

Dated:        June 30, 2026
              Brooklyn, New York

16